JAMES G. & S. HALL *vs.* GEORGE A. THOMPSON.

Where a purchaser has examined an estate which has patent defects that could be discovered by ordinary vigilance, he can have no relief on account of such defects.

T. sold a tract of land to H., and represented that it contained only fifty or sixty untillable acres; whereas, about three hundred acres were unfit for cultivation —but, prior to the sale, H. examined all the land more than once. Held, that H. was not entitled to rescind the contract on the ground of misrepresentation; *sed aliter*, if fraud had been employed to conceal the defects.

Where the facts lie equally open to both vendor and vendee, with equal opportunities of examination, and the vendee undertakes to examine for himself without relying on the statements of the vendor, it is no evidence of fraud in such case, that the vendor knows facts not known to the vendee and conceals them from him.

A vendor about to sell a tract of land, pointed out to the vendee the probable western boundary, which had no marks to designate it, but was an " open line," and its definite position was not certainly known; after the purchase, upon a survey of the line, it was found further east than was represented, cutting off twenty-five acres that the vendee thought he was buying, without, however, diminishing the number of acres he contracted for, or their quality. Held it was not such misrepresentation as would entitle the vendee to cancel the contract.

It would, perhaps, be otherwise, if the deception were gross.

A court of equity will not cancel a contract on the ground of misrepresentation, unless that misrepresentation be in reference to some material thing unknown to the purchaser, either from not having examined, or for want of opportunity to be informed, or from entire confidence reposed in the vendor; in either of which cases, his remedy must be pursued in good time after the injury is discovered.

A misrepresentation about a mere matter of judgment, is no ground for relief.

A concealment of material facts known to the vendor and unknown to the vendee, which are calculated to influence the action or operate to the prejudice of the vendee, is fraudulent.

A vendee, in the course of conversation with his vendor about the land sold, among other things, charged the vendor with having concealed a deed of trust that was an incumbrance on the property, who did not either admit or deny the charge. Held, that the vendor's mere silence was not sufficient evidence of fraudulent concealment, to justify a rescission of the contract.

The taking a bond for title, implies either that the title is imperfect and time is required to perfect it, or else that the vendor retains the title for his own security.

Where a bond for title is given, and it is clear the vendor never can make a title, a court of chancery will relieve the vendee from the payment of the purchase money.

Possession of real estate, is notice to creditors and purchasers of all the equities of the person in possession.

The certificate of a justice of the peace, that the grantor in a deed " acknowledged the foregoing instrument to be his act and deed," is equivalent to the certificate required by the statute, that the grantor " acknowledged that he signed, sealed and delivered the foregoing deed ;" and is a sufficient acknowledgment.

A misrepresentation on the part of a vendor that is unaccompanied with injury to the vendee, is not sufficient ground to rescind the contract of sale; the deceit must work damage.

When it is doubtful upon the evidence whether or no there has been undue concealment of material facts by the vendor from the vendee, the court will not therefore set aside the contract of the parties; this should only be done on clear proof.

THIS cause is brought by appeal, from the decision of the Chancellor of the State.

The original bill was filed by the complainants, James G. and S. Hall, against the defendant, George A. Thompson, on the 25th of October, A. D., 1838. It averred in substance, that on the 29th of November, 1836, the defendant executed to them a bond to make title to a tract of land; which bond is made exhibit A. to the bill. The condition of which is as follows:

" The condition of the above obligation is such, that, whereas the above bound George A. Thompson hath this day sold unto Spence Hall and James G. Hall the northeast quarter of section ten, the east half of the northwest quarter of section ten, the southwest quarter of section ten, the east half of the southeast quarter of section nine, the west half of the north-west quarter of section fifteen, the north half of west half of southwest quarter of section fifteen, west half of southeast quarter of section ten, the south half of the south half section three, the north half of the east half of the southeast quarter of section ten, the north half of the west half of the northeast quarter of section fifteen, being nine hundred acres, lying in Yalobusha county, State of Mississippi, at the rate of twenty dollars per acre, being the sum of eighteen thousand dollars; for which the said Spence Hall and James G. Hall have given their notes,

one for six thousand dollars, payable March 1, 1838, and one for six thousand dollars, due March 1, 1839, and one for six thousand dollars, due March 1, 1840. Now, on the payment of said notes upon a proper presentation of the same, the said George A. Thompson doth bind himself, his heirs, executors and administrators, to make the said Spence Hall and James G. Hall, their heirs or assigns, a good and perfect title in fee simple, under warranty (general) to all and every part of said land; then this obligation to be void, otherwise to remain in full force and virtue."

The bill then stated that the complainants were strangers in Mississippi, and being desirous of settling in the State, were recommended to the defendant as "an honorable man, with whom they could safely deal, and being informed that he was desirous of selling his lands, were induced to examine them, and made the purchase as aforesaid; that at the time they examined and purchased," the defendant was keeping a tavern on the property; that the site of the house was immediately on the stage road from Manchester (now Yazoo city) in this State, *via* of Benton, Lexington, &c. to Nashville in Tennessee; that there was a superior well of water on the place, and that the stages changed horses and the travellers breakfasted there; that while the complainants and defendant were in treaty for the land, the defendant showed to the complainants "what he alledged embraced the tract, and rode round the same, pointing out to your orators what he alledged to be the boundary lines, and represented all the lands embraced in said lines to belong to him, free from incumbrance, and stated" his ability then to make a fee simple title, and willingness to take a deed of trust to secure the purchase money; but the complainants preferred taking merely a bond for title.

That at the time of treaty and purchase, the defendant represented that the land contained three hundred acres, then in cultivation, and that he "also represented that the eastern boundary of said land, by a line running north and south, included three inclosures around the dwelling house" and the out houses; that, induced by these representations, the complainants bought

and took possession in February, 1837; that some time in that year the complainants discovered that the lines pointed out by defendant did not embrace . the house and inclosure, as represented; but that portion of the inclosure belonged to one Brooks, portion to one Ragsdale, and portion to Carpenter & Irish, excluding about thirty acres of good land, represented to be embraced within the boundary they were buying. That the defendant pointed out an inclosure *as being the lines of the tract,* and showed a stake at a point, as the corner of the tract he proposed to sell; but that in a survey they made after the sale and the delivery of possession, on the 21st and 23d of July, 1838, "it was discovered that the true line cuts off the east side of the inclosure, and takes the corner of several of the houses, between the true line and the houses, and does not leave near space enough for building;" and that the defendant never intimated that he did not own all the land within the inclosures.

The bill states further, that the defendant, before the sale, represented that there were but sixty acres of untillable land, in which representation they relied; that they paid the defendant $3000 before they discovered the imposition that had been put upon them; that having ascertained that Brooks owned part of the yard inclosed, they were induced to look more closely into the matter, and they found there were three hundred acres in the tract wholly unfit for cultivation; and that Thacker W. Winter held a deed of trust upon six hundred and eighty acres of the most valuable part of the land, of which they made an exhibit to the bill, and which recited an indebtedness on the part of the defendant to Winter of $7077$\frac{38}{100}$, due in three equal instalments, in January, 1836, 1837 and 1838; in the deed of trust there was a power of sale on sixty days notice, in case of failure to pay; that the defendant had no color of title to forty acres of the tract; that two inclosures of the tract did not belong to defendant, and that part of another inclosure was in the same iondition; that, ascertaining these facts, they called on Thompson, tendered him his bond, and demanded their note; that the defendant admitted he had at the time of sale no title

to forty acres of the tract, but stated that he had since acquired it by purchase, and refused to rescind the contract.

The bill then charged 'that the title to the south half of the north half of the west half of the northeast quarter of section fifteen, which was land of the best quality, was in one A. Bangsdale; that the defendant had, by exhibiting inferior lands to them, of a poor and broken quality, when examining one King's land in the neighborhood, which had been offered them for sale at $10 per acre, induced them to reject the offer and buy his own land, when in fact the land which they had really been offered at $10 per acre, was fine land, but the defendant had fraudulently led them over broken and hilly land to induce them to buy his own; and after they had bought his, the defendant immediately purchased the other.

The bill charges that the defendant wholly concealed from the complainants the deed of trust in favor of Winter, and that they would not have bought if they had known either the defect in title, in boundary, or in quality of the land; that immediately after they purchased, the land rose in value, and they could have sold it at a greatly increased price, but for the incumbrance and want of title in the defendant; that they have put $1000 worth of improvements on the place.

The bill states further that the defendant had sued them in Yalobusha county upon the note for $6000, then due; and therefore the bill prayed for injunction, which was granted, and that the defendant should refund the $3000, and pay for the improvements, and that the contract of sale might be rescinded, &c.

The answer of the defendant, Thompson, was filed the 7th day of January, A. D. 1839. It admitted the sale of the nine hundred acres, but stated that in arriving at the number of acres, the eighths of land, were all estimated at eighty acres each, by a distinct agreement between the parties; that the complainants came to his house in search of lands for a location; they remained at his house several days looking at lands in the neighborhood, and at length offered to purchase of defendant. He asked them $25 per acre, and they determined to look at his

land, and he accordingly exhibited it to them.   They were pleased with the land, but thought the price too high, and went off to look farther; after an absence òf three days, they returned without having purchased, but with a memorandum of the lands belonging to King, in the neighborhood; that he with them and an agent of King's, rode round King's tract, and that they were pleased with it, but declined purchasing because it was wild land; and that he afterwards agreed to sell his own land at $20 per acre, and the complainants purchased of him. The answer denied that the defendant had undertaken to show all the lines of boundary and corners to the land; he only undertook to show those which he knew; many of the lines were "open lines," and the corners unestablished; neither of which did he pretend to point out; the answer denied that he represented to complainants that the land was free from incumbrance, or that his title was perfect in fee simple to it; that the deed of trust to Winter, upon which $630 was then due, was a lien upon it, nor had he perfected some of his other titles; that he held an offset against Winter for about the amount due upon the deed of trust.   He admitted that he had offered to give a deed and take a deed of trust upon the land to secure the purchase money; and that he had since the sale urged it upon complainants to pay off the deed of trust to Winter, with the first payment due to defendant.   He denies that he represented there were three hundred acres of cleared land in cultivation, but states that, upon their inquiry, he gave it as his opinion that there were two hundred and fifty acres cultivated, which is still his opinion.   He denies all the misrepresentations of boundary with reference to the land and inclosures about the house, and states, that he pointed out clearly and distinctly the real boundary; and that the complainants knew well what the line was; that part of the contract, not written, however, was, that complainants should put up another cabin, and in pointing out the location of the proposed house, he cautioned them not to erect it in that part of the lot that did not belong to them, as the owner might be troublesome.

The answer stated, that with reference to the lands of Car-

penter & Irish, and the direction of the eastern boundary, he did not state positively its direction; it was an open line, and he could not know its bearings or corners, and he so informed them; that with reference to the land claimed by Barksdale, there was a mistake in the title bond of twenty acres; that much having been previously conveyed by him to Barksdale, and the complainants were so informed at the time; that one of the complainants drew the title bond, while he himself was unwell, and the draftsman of the bond made a still greater mistake than the insertion of twenty acres not sold, in the omission to include one hundred and sixty that were actually sold; and that he distinctly pointed out what portion in his inclosure was the property of Barksdale. The defendant again denied all misrepresentation about the inclosures around the house, and in his answer, states minutely the examinations made by the complainants and the information given by him; the defendant does not admit the correctness of the *ex parte* survey made by the complainants, and he denies all misrepresentation about the character or amount of the land, and states that the complainants examined diligently and carefully for themselves, and relied entirely upon their own judgment. That they examined the land again and again both before and after the sale, and expressed themselves perfectly well pleased with the property, and never once alluded to the misrepresentations of fraud alledged to have been practiced, until after the great pressure in money matters come upon the country, and the land fell in value. The answer admits the payment of $3000; denies that he represented only sixty acres to be untillable; denies that three hundred acres are worthless; admits that he refused to rescind the contract, but denies that at that, or any other time, he admitted he had not purchased the forty acres; he stated and admitted that he had no title, but had paid for them and has since received the title. He denies all fraud in showing the complainants the land of King; says he had never seen the land before and has never seen it since, and has never purchased one foot of it. The answer denies all knowledge of any improvements that the complainants aver they have put on the land, and denies that

the complainant ever lost a sale of the land in consequence of the existence of the deed of trust, and states that he had often urged them out of the moneys due to discharge and satisfy it. The answer admits the institution of the suit at law, and judgment on the first note, and prays to be dismissed, &c.

Upon this state of the pleadings the chancellor dissolved the injunction on the 21st of January, 1839.

The complainants afterwards wrote a supplemental bill, and obtained another injunction from the circuit judge, without filing their supplemental bill in court, and the chancellor, on the 8th of June, 1839, dissolved the second injunction.   The supplemental bill was however afterwards filed, and commissions were opened to take depositions.

On the 20th of June, A D. 1839, a motion was made to set aside the order dissolving the injunction, but was overruled.

On the 2d of December, 1839, the supplemental bill referred to was filed in the court below, and stated in substance, as follows : it filed a copy of the original bill and made it part of the amended and supplemental bill, as exhibit No. 1.   It charged that the defendant in his answer to the original bill had denied all the material allegations thereof except as to the existence of the deed of trust, and made his answer exhibit No. 2, to the supplemental Bill :

It further stated that one of the complainants lived in Tennessee, the other in Yalobusha county in this State, at some distance from Jackson, where the court of chancery was holden. That the injunction had been issued by the circuit clerk, at Coffeeville, with whom the bill had been filed; and that the solicitors of the complainants had given the defendant a copy of the original bill, on condition that he would supply them with a copy of his answer; which he designedly did not do, in order that he might, by withholding his answer from their inspection, obtain a dissolution of the injunction before they could obtain proofs in support of their bill; that he filed his answer during the January term, 1839, when they for the first time had an opportunity of inspecting it; that the defendant immediately on filing his answer entered a motion to dissolve the in-

junction, which, by the rules of the chancery court, was heard five days after it was made; and the injunction was accordingly dissolved; they not having had time to obtain proofs in behalf of their bill: and not having time, in consequence of the distances at which witnesses lived from Jackson, and the rules of the court, to get the depositions during the then session of the court.

The supplemental Bill then averred, that so far from the amount of the deed of trust of the land in controversy, in favor of Winter, being paid so as to release the land, the trustee named in the deed had advertised the land for sale to satisfy the debt named in the deed of trust, and at the same time the defendant was striving to coerce from them, by sale of their negroes, the amount of complainant's purchase money reduced to judgment: that they have understood the defendant was greatly indebted, and they were apprehensive, on just grounds, that if driven to a suit against him, to recover back any money they might now be compelled to pay, a recovery against him would be unavailing: that the defendant's bond for title would be no adequate remedy:

That part of the land in controversy, was purchased of the Federal Government by one Ellis, whose wife was still living and her right of dower not relinquished; portion by James Blackburn, whose wife was still living and her right of dower not relinquished; portion by Thacker W. Winter, whose wife was still living and her right of dower not relinquished; that the portions of the land in which dower was unrelinquished embraced nearly the entire tract; of which facts they were unacquainted when they filed their original bill, and which Thompson fraudulently concealed.

The supplemental Bill stated further, that complainants did not believe Thompson had paid the debt to Winter, as averred in his answer, because Winter had, before the filing of the original bill, transferred it to one Warren, of the State of Tennessee, whom Thompson had not seen. The exhibit No. 3, to the supplement, was a copy of the advertisement for sale of the land in controversy, to pay the debt to Winter. Exhibit No. 4, was a certificate of the register of the land office, at Chocchuma, showing the original purchasers of the land.

The supplement then referred to the great pecuniary embarrassments of the country, the difficulty of raising money except by loans upon real estate, which the imperfect title they had would prevent their effecting; that the north half of the west half of the northeast quarter of section fifteen, was government land; that the wives of Fisk, Jamieson, Flack, M'Daniel, Hudson and Winter, were each entitled to dower in the land; that Thompson withheld his title and would not disclose it, leaving them to grope in the dark in ascertaining what title he really had; and concluded by praying an injunction.

On the 28th of December, 1839, J. S. Ayres, one of the counsel for complainants, filed an affidavit, setting forth the reasons why the supplemental bill had not been filed according to the rules of court, in the proper time, and after argument, the court, on the 28th of that month, ordered the injunction to be reinstated upon complainants paying the costs of the supplemental bill and of the motion.

On the 9th of June, 1840, the defendant, Thompson, filed his answer to the supplemental bill. He denied his alledged promise to furnish complainants' counsel with a copy of his answer, and stated that his answer was filed on the first day of the court, and was not withheld; charged that the complainants issued no *subpœna* upon their original bill, for the purpose of gaining the delay of a term of the court in the payment of their debt, which he defeated by voluntarily filing his answer. That the defendants were not "surprised" at his motion to dissolve, for they had affidavits in readiness to read upon the motion.

He admitted that the lands had been advertised for sale for the debt due Winter, being about six hundred dollars, but that he had enjoined the sale, on the ground of an offset in his favor of about five hundred and ninety dollars, and that his injunction had been sustained; that the complainants had not been in any wise molested in their possession or enjoyment of the estate.

He denied the alledged attempt to sell the complainants slaves, because the forthcoming bond given by complainants was not forfeited when they obtained their second injunction. He admits his indebtedness, but states that it is owing entirely to the

bad faith, of complainants, whose debt to him, if paid, would free him from all embarrassment.

The defendant then set out the following train of title, with reference to dower interests in the land. Part of the land was purchased of Thomas Y. Ellis, deceased, his wife's relinquishment of dower, filed as exhibit 1, to the answer. A portion was entered by James Blackburn, also now deceased, his wife's relinquishment appears in exhibit 2. A portion was entered by Thacker W. Winter, whose wife relinquished her dower, exhibit 3.

He admitted the transfer of the Winter debt secured by the deed of trust to Warren, but stated that the transfer could not affect his offsets, and that he had over and again offered to credit the complainants with the full amount of the balance due on the Winter debt, if they would pay it, which they uniformly refused to do.

He admits the monetary embarrassments of the country, but states that he has again and again offered to make the complainants a title in fee simple, if they would only secure him the purchase money.

He denied positively that the north half of the northeast quarter of section fifteen, was government land, but exhibited the certificate of entry in favor of McDonald, and transfer to himself. He admitted Jamieson's entry of eighty acres, but showed his transfer to Winter, before Jamieson was married. Flack never owned any of the land, and McDonald's wife relinquished her dower to one of the defendant's vendors, as was exhibited and shown. Barksdale's wife made a quitclaim to the defendant, which was also filed. Hudson never owned or had any interest in the land, and of course his wife could have no right of dower.

The defendant then detailed in part his title to the court, by exhibits, being deeds from John Kirkpatrick, George Barringer and Isaac Thompson, and various other exhibits, in number, twenty-seven, showing the chain of title in Thacker W. Winter, from whom he derived the principal portions of the land in controversy, and states his full ability to make a perfect and unincumbered title.

In the month of June, 1840, the complainants filed an amended and supplemental bill, which stated in substance, that the defendant claimed to hold title to part of the land in controversy, by virtue of a deed from Thacker W. Winter, to him; and that that deed was neither acknowledged or recorded so as to vest title in the defendant; that Winter was insolvent, and judgments to a large amount now outstanding against him, and which constituted a lien on the lands; that the deed from Winter was made in the year 1834, but was not recorded until the 22d day of June, 1837, after the purchase made by the complainants; that Winter pretended to derive title to part of the land he sold defendant, from one Andrew J. McDonald; that they do not believe McDonald ever made a deed to Winter, and that judgments to a large amount exist unsatisfied against McDonald; that Winter pretends to derive title to part of the land, from Blackburn, who they believe never made a deed to Winter, or, if made, that it was never recorded, and that the land was liable to be sold to pay judgments against Blackburn; that Winter pretends to derive title from Robert Jamieson, to part of the land, but they do not believe Jamieson ever made him a deed; and that Winter pretends to derive title to part of the land, from Monroe G. Ellis, who they believe never made a deed; and that Ellis or his heirs are now the owners of that part of the land; that to the same part of the land, the title to which is in Ellis, Winter pretends to have derived a title from the said James Blackburn, but that Blackburn's deed to Winter was not properly acknowledged or recorded, and that he was insolvent, and judgments against him, binding the land.

That the defendant pretends to derive title to part of the land from John Kirkpatrick, by deed filed for record on the 12th day of May, 1840; that Kirkpatrick was then utterly insolvent, and calls upon the defendant to disclose whether judgments were not then in existence against Kirkpatrick.

That the defendant had not exhibited his title papers to that part of the land he derived from Barksdale.   The amended, &c. bill, then prayed for *subpœna*, and repeated the allegations contained in it, again, by way of interrogatory.

In the same month, June, 1840, the defendant filed his answer to this amendment and supplement.

He admitted the sale from Winter, and submitted to the court the sufficiency of the acknowledgment and record; denied that any judgment existed against Winter, prior to the sale to complainants, and stated that they knew his title came through Winter before they bought. He admitted the derivation of the title to part of the land from McDonald, and submitted to the court the sufficiency of the transfer, which was made an exhibit to the former answer; and states that at the time of McDonald's sale, he was not insolvent, and no judgments existed against him, and that he believes none now exist.

He admitted that Winter derived title to part of the land, as exhibited in his former answer, by the transfer of the certificate of entry of the land, from Blackburn; that he believes Blackburn never made a deed to this portion of the land, to Winter; that he admits Blackburn is now insolvent, but denies that he was so at the time of the transfer, and that, therefore, the land is not subject to the debts and liabilities of Blackburn; that Blackburn lived within half a mile of the complainant, and that they were very intimate with him, and knew, ever since they filed their first supplemental bill, the defendant derived title to part of the land through him, and yet they never made this objection till now, when Blackburn and his wife have both emigrated to Texas. He admitted his derivation of title from Jamieson, and referred to exhibit No. 6, to his former answer, for the mode by which the title passed, and that the same was the state of fact with reference to the land purchased of Ellis; the title being passed by a transfer merely of the certificate of the receiver of the land office of the entry of the land, by the holder of the certificate, which he contended was a good title.

He admitted Blackburn's sale by deed of another part of the land to Winter, and referred to the title papers exhibited with his former answer, and contended for their sufficiency, and denied that if any defect existed in the mode of the transfer or the official certificate of it, it could affect his title or subject the land

to the debts of his vendor. He admits his derivation of title to part of the land from John Kirkpatrick, who entered portion and bought portion from one George Barringer, who made a deed to it to Kirkpatrick, as Kirkpatrick avers; that Kirkpatrick is entirely solvent; whether or no Barringer has made him a deed he does not of his own knowledge know; that it was only the east half of the south half of the southwest quarter of section three that Barringer ever owned and Kirkpatrick sold.

He admitted the purchase of part of the land of Barksdale, and referred to his other answers for an exhibit of its character and sufficiency. He admitted Winter's insolvency, but denied that it all affected the sale by Winter to defendant, as the former occurred long since the latter, and referred to his answer and its exhibits, to the original and supplemental bill for a detailed statement of his title.

He stated that immediately upon his purchase from Winter, he took possession of the land sold, and resided on it up to the time he sold to the complainants in November, 1836, and that the complainants took possession in February, 1837, and have retained it undisturbed ever since, and that Winter had been prior to his sale to the defendant in quiet possession of the same land ever since his purchases from the various persons in the various modes set forth, and he denied therefore that any informality in any of the records or acknowledgments could affect his title.

The following is the certificate of acknowedgment appended to the deed from Thacker W. Winter to the defendant, George A. Thompson :

" Personally appeared before me, John Boon, an acting justice of the peace for Yalobusha county, T. W. Winter, and acknowledged the foregoing instrument to be his free act and deed, December 6, 1834.

"JOHN BOON, Justice Peace. (Seal.)"

The acknowledgment to the deed from James Blackburn to

Thacker W. Winter, was made by one of the subscribing witnesses, who witnessed the deed in the following words:

" Signed, sealed, and delivered in presence of
" Jno. H. M'Kinnie.
" Thos. B. Ives.
" Reuben Hearne."

The acknowledgment was as follows:

" The State of Mississippi, Yalobusha County.
" Personally appeared before me, D. W. Rayburn, clerk of the probate court for said county, the within named Thomas B. Ives, one of the subscribing witnesses to the foregoing deed, and made oath that he saw the within named James Blackburn sign, seal, and deliver the same to the within Thacker W. Winter, and that he saw the John H. M'Kinnie and Reuben Hearne, the other two subscribing witnesses, sign the same in presence of each other, in the day and year therein specified.
" Thos. B. Ives.
" Sworn to and subscribed before me this 26th day of January, 1835.
" D. W. Rayburn."

Upon the hearing of the case, on the motion to dissolve before the chancellor, the following depositions and proof were read and exhibited:

The deposition of A. Barksdale proved that he purchased sixty acres of land of Geo. A. Thompson, the defendant—the south and west half of northeast quarter section fifteen—the line was established by the county surveyor, and the fence was within three or four feet of the line, and was there before Thompson sold the land to complainants; that he told one of the complainants, in 1837, that the fence was about the line. Spence Hall, one of the complainants, told witness he wished him to let the fence on the road remain; he stated to witness that Thompson told him that the land within that fence belonged to witness,

and that Thompson and witness, had talked of exchanging the land within the fence, for land lying north of that bought from Thompson; complainant further stated that he had not obtained a title, but as soon as he did, he would make the exchange. Witness is somewhat acquainted with the land sold by defendant to complainants. As far as he knows, it is a fair tract for the county—lands of no better quality, in the neighborhood, sold at $20 per acre, part cash; witness' lands adjoining, he would not have sold for that price, unless part was paid in cash. The conversation between Hall and witness, was some time in 1837. The lands north of the Troy road, he does not suppose to be as good as those on the south; complainant stated to witness that Thompson never told him that the fence was on witness' land; that it was about two hundred and fifty yards from it, and cut off about one acre of witness' land; showed Hall the stakes on the line between witness' land and that purchased by complainants from Thompson; the stakes were set up in the fall before; witness has three hundred and forty acres of land, which he considers more than an average, as compared with the land in the neighborhood; did not know the lines of the land sold by Thompson to complainant, north of the Troy road.

William Murphy, a witness for complainants, stated that he acted as their overseer for the year 1837; that the cleared lands on the tract, purchased by complainants from defendant, were in eight different parcels, and that there was not more than one hundred and forty or one hundred and fifty acres in the whole; there was about fifty or sixty acres besides of deadened land, which had never been grubbed, and was so grown up in vines and briars that it was more difficult to bring into cultivation than if it had never been deadened, and just taken out of the woods. There was a field south of the Grenada road, containing about six acres, and south of that there was a space of about six acres more, which was in the condition above mentioned. Witness cleared about one hundred and ten acres of land, which could not have been done for less than eight hundred dollars. The value of additional labor bestowed by witness, in clearing up hedge-rows and putting the fences in a good condi-

tion, was worth one hundred .dollars.   The southern line runs through the yard, very near the smoke house, and very materially injures the building site, and the value of the improvements, as it throws the settlement nearly on the side of the hill.

Jeptha Folkes states that he was present at a conversation between one of the complainants and defendant, early in the year 1838.   In that conversation Hall charged Thompson with having practiced a fraud upon him and his brother, in the sale of a tract of land, and offered to give him back the land, and tendered to him the title bond, and demanded the notes he had given.   Thompson denied the fraud, and refused to receive the land or deliver up the notes, and inquired in what he had been guilty of fraud?  Hall charged him with having concealed from them a deed of trust which encumbered the property, and which he said lessened the land's value, and prevented him from selling it to advantage.   Thompson did not deny the deed of trust, but said they had nothing to do with it; that he intended to discharge the debt, and free the land from that incumbrance, and that he was then willing to pay off the trust and make them a title.   Hall also charged him with having fraudulently shown them an inclosed field as belonging to the tract of land, which did not belong to it; and that the piece of land now found to be claimed and owned by another, was a part of that sold, although it was within the inclosure, and left them to believe that the whole field belonged to the tract he had sold.   Thompson replied to this, that he had told them the field contained three hundred acres, and he still said there was three hundred acres within the inclosure.   He did not deny that he had shown the whole field, without informing them that a part was claimed by another individual.   Hall further stated, that from information he had received from a man by the name of Flack, that the fence between Carpenter & Irish and Thompson, was on the land of the former.   Thompson said this was false—that a surveyor would settle the question—and that instead of its being on the land of Carpenter & Irish, he had twenty, or thirty, or forty acres between this fence and the line.   Hall further charged him with an intent to deceive him, by proposing to

execute a deed to the land while it was incumbered, and he could not convey. Thompson replied, that although he then had no title for some forty acres of the land, yet he said he could procure it when he saw the owner; that subsequent to the sale he had made to them, he had bought it, and was then able to make a deed. Hall replied, that he had wilfully suppressed and concealed the fact, that the line passed through the yard, cutting off a part of the inclosure, and some of the buildings. To which Thompson replied, that he had showed them a stake north of the road, near the stables, which was the corner, and that he told them the line run to some certain point of the compass, which was south, and they ought to have known it would cut off a part of the yard.

John A. Arnold states that he has read the deposition of Dr. Folkes, and that it is correct, except that he does not recollect that anything was said about any other field, inclosing land not belonging to the tract, except where the land of Carpenter & Irish was encroached upon, and where the line passed through the yard. Hall charged Thompson with having shown him land in the field that did not belong to him, and Thompson did not deny it, except as stated in Folke's deposition.

William J. Watson states that he was in the employment of Thompson as overseer, in 1836, at the time the land in controversy was sold to complainants; that previous to the sale, and whilst the parties were in treaty for it, he heard Thompson direct James Peele to show the lands of Alexander Barksdale as a part of the tract he was about selling, as that was very fine land, and much better than that adjoining, which he was about to sell; and that said Peele was directed to conduct complainants so as to keep them from seeing the west and poorer land contained in the tract; that he heard Thompson ask Peele if he had showed the land as he directed, to which Peele replied in the affirmative, and Thompson said " good," and expressed his satisfaction at the manner in which his directions had been complied with; that he heard Thompson say soon after he had made the sale, that he had sold complainants, as a part of his land, forty acres which belonged to Thacker W. Winter, which he

could purchase in a few days for $5 per acre, for which he was to get $20. Witness asked Thompson if he had shown the land to complainants? and upon his replying he had, he asked him if he had shown the west land, between the hill and creek? to which he replied he had not—he was very clear of it—it was no part of his businsss; that he had heard defendant state, after he had made said sale, that he had caught a sucker, and that he had got clear of land that was of no account, or at least some of it; that whilst they were in treaty for the land, he heard complainants ask defendant how much land there was inside of the fence? to which he replied that he did not know; but that all the land within the fence was his. This had reference particularly to the big field, lying between the Troy and Grenada roads. That, in the spring of 1836, when witness was about to repair the fence around the big field, he was informed by Mr. Barksdale, that he had a small strip of land in the fence, and he did not wish the timber to be cut off; and deponent, in order to ascertain where the line run, staked it for some distance, but did not cross the road to the south, and has no recollection of ever staking any other line of said tract at any time; that he has no recollection of any other stakes running across the road into the little Blackburn field south of the road, at the time of the sale; that he does not know how far the land of Barksdale joined the lands sold to complainants—it might be one hundred yards or more; nor does he recollect whether the stakes he stuck were standing at the time or not.

James Peele, a witness for defendant, states that he lived with defendant about eighteen months, and was present and heard part of the conversation between complainants and defendant about the sale. Spent a whole day with complainants and defendant, in riding over the land, which King, as agent for Carpenter, wanted to sell to complainants. As they returned home, they passed the northeast corner of the land sold by defendant to complainants. The corner shown was about one quarter of a mile from the northeast of section ten. Witness went with complainants at the request of defendant, who was ill, to show them the land, and point out the corners. He did so, and with them made

a full and thorough examination of the whole land; following the lines at times, and at times not, going over the whole tract, which he particularly describes and states in his testimony. The complainants were about two weeks at the defendant's house before the trade was concluded. Witness told complainants not more than sixty acres of the tract was untillable. Does not recollect that defendant said anything about the quality of cleared land, but witness stated to complainants that there was about two hundred and fifty acres. Does not know that defendant, at any time before the trade was closed, pointed out to complainants only poor and broken lands, unfit for cultivation, or anything being said about it. When the parties went to examine the lands, they passed over some as poor as any in the tract sold to complainants, except the mountains. Witness was asked by complainants where the line would cross the mountain? Replied it would pass about the middle of it. The crib and stables were on the southeast corner of section three, the crib about twenty, and the stables about thirty yards from the corner. The family residence was on the northeast corner of section ten, about sixty yards from the corner. The section line was plainly marked; it passed through the edge of the yard, cutting off about ten feet at the greatest extremity, and struck the corner of the smoke house, which was about one foot over the line. There was a small chicken coop upon Flack's land, and one or two marked trees in the yard. Does not know whether defendant showed the complainants the line which passes through the yard. Witness showed them the line south of the yard some twenty or thirty yards from the yard, for nearly quarter of a mile; and had previously shown the line north of the yard about a quarter of a mile, being on section three. Defendant did not represent himself as being acquainted with Carpenter & Irish's lands, nor did he act as guide. Did not hear complainants say anything against those lands, but said they thought it better to buy the defendant's tract, as it was improved; they did not like to go into the woods; defendant and complainants went two or three times to examine the land; they were absent two or three

days at a time to examine lands; but does not know that they examined any but Flack's and defendant's.

Cross-examined by complainants. States that he resided about seven months with defendant, after the sale of the land to complainants; has always been intimate with defendant since their acquaintance, which commenced in 1834; the subject of the sale has not been a subject of conversation between himself and defendant but once, that he remembers; upon being asked, when called upon to give an affidavit before J. Boon, Esq., to say and testify upon oath, if he did not say he recollected but little about the matter, as he did not expect to be called upon about the matter, and did not charge his memory with it, or the circumstances that transpired relative thereto? he answered that he did so state, but since he has been called upon to testify, he has endeavored to bring to mind what did take place; when he made that statement, he did not know much about the contract between complainants and defendant, and alluded to the price and payments, and not anything relative to the lines or the land; does not remember any particular conversation which he had with complainants at the time of showing the lines; they talked generally about the lands.

The deposition of James Peele was afterwards re-taken, for the purpose of rebutting the testimony of William J. Watson, on which occasion he testified as follows:

That he showed the lands to complainants which were sold to him by defendant; that he was not requested by defendant to show the lands of Barksdale, as a part of defendant's land; that the land of Barksdale, where it joins the lands purchased by complainants, is no better, but the wet part is inferior; defendant did not, at any time during the treaty for the land, request witness to show the tract in such a manner as to keep complainants from seeing the poor and wet lands contained in that he was about selling; nor was he at any time requested to show them in a deceptive manner; nor did defendant at any time ask witness if he had shown Barksdale's land as a part of the tract he was about selling to complainant; nor did defendant, at any time, ask him if he had avoided showing the wet and poor land

contained in his tract. The land of Barksdale joins that of com-
plainant's about one and a half miles; thinks that it was in the
spring, or early in the summer of 1836, that defendant purchased
the forty acre tract from T. W. Winter. In showing the lands
to complainants, witness showed to them a part of a big field, be-
tween the Troy and Grenada roads, which he told them was not
the defendant's; does not remember that either of the complain-
ants made any reply to his remark. Did state, upon oath, be-
fore J. Boon, Esq., that he recollected but little about the conver-
sation and contract between the parties. Was acquainted with
Wm. J. Watson during the year 1836 and a part of 1837, but
knows but very little of his character for truth and veracity.

The deposition of Isaac Thompson states, that he was ac-
quainted with William J. Watson, whilst he was overseeing for
defendant. Heard him say, that the land sold by defendant to
complainants was the best in Mississippi, and that defendant
missed it by selling it. Had a conversation with Watson, some-
time in September, 1837, about the sale of the land. Watson
said the land was fairly shown by Peele to complainants, and
that it was a fair trade. Understood Watson to say, that he was
present during a part of the time. Watson was hired to defend-
ant, but did not stay all the time he was employed to stay with
him. He was dissatisfied at leaving him, and witness heard
him say, with an oath, on the 1st of November, 1837, that he
would injure the defendant as long as he lived, or the balance of
his days, in any way he could—he would have revenge. Witness
is about seventy-four years of age, father of defendant, lives on
the same plantation with him, about one quarter of a mile apart.
Is not dependent on defendant for a support; attends to his
business occasionally. Did not like Watson nor Watson him.
In relation to the language used by Watson, in speaking of hav-
ing revenge, he said defendant was a rascal, and he would injure
him every way he could.

The deposition of James Wade, Esq. states, that he has
no reason to offer why he should not believe William J.
Watson, on oath, and "when not under the influence of the
intoxicating principle." Thinks him rather too much "of a

revenging character," and malicious disposition towards those he is dissatisfied with.

Benjamin Land, a witness for defendant, states that defendant showed to complainants the line at the corner by the stables. The defendant, when he showed it to complainants, said, pointing to the land owned by Flack, that if they purchased his, they had better buy Flack's or remove the buildings, as he was a troublesome fellow. Defendant remarked, that this was a good tract of land. Heard Peele say to complainants, that Barksdale would take some of the land off the little field, on the left hand side of the road. Did not hear Peele say anything about the land on the right hand side of the road. There was a good deal of conversation, as they rode along, and when at the south end of the little field, one of the complainants remarked, that if the land continued as good as it was, where they then were, they did not wish to examine any farther. Peele replied, that it was pretty good. One of the complainants asked Peele how far the line between Carpenter & Irish and defendant, would run west of the fence. He replied, a hundred and fifty or two hundred yards; that it was an open line. Defendant had previously shown to witness, part of the lines on his land, and offered to sell him the same for $25,000; thought the price was high—he represented the land as being good, and witness thought it was good, so far as he had seen. Defendant observed to witness, that there were about fifty or sixty acres unfit for cultivation; his overseer also represented to witness the land as good; witness told complainants he thought it was good land, and that they could not do better than to purchase it at the price asked, provided cotton remained at the price it then was. After complainants had purchased, he told them he thought they had got a good bargain. He had travelled the Grenada and Troy road, and could see a good part of the land. Does not recollect that he heard complainants make any complaint about the land, or the price thereof; immediately after the purchase they took possession. Flack offered to sell his land to witness for $15 per acre, half cash. He afterwards sold to Brook for $20 per acre. It was superior wild land.

Witness had heard James G. Hall, one of the complainants, say that there was no dispute about the quantity of the land sold to·them, according to King's survey; that as to the land in Barksdale's field, if it overruns twenty acres, according to that survey, it was a mistake.   Neither defendant nor Peele showed the complainants the land in Barksdale's field, as a part of the tract.   If King's survey overrun nine hundred acres, it was a mistake.   On cross examination, he states that he does not recollect that either of complainants expressed any satisfaction with the purchase soon after it was made.   Complainants were seven or eight days in the country before they made the purchase.   After his return to Mississippi, in March succeeding the purchase, J. G. Hall observed to witness that he would like to sell the land, but assigned no reason for it.   In a subsequent deposition, he states that he was at defendant's house in the fall of 1836, about the time the sale was made.   Heard William J. Watson say it was a very fine tract of land; witness had some notion of purchasing the land at the time; he also stated that Thompson was a gentleman, and if witness purchased the land he would deal fairly by him.   Heard Thompson say that he, thought Watson was a clever fellow when sober, but that he would get drunk, and then he had no confidence in him.   From his acquaintance with Watson, he could say nothing for or against his character for truth and veracity; did not hear Peele say that any part of the land in the big field did not belong to defendant, though he might have so stated in viewing the land. Witness supposed that all the land, on the right of the line, belonged to defendant; heard defendant say, that he would agree that Watson's deposition in this case, might be read on the trial of a cause in the circuit court, as evidence, for the purpose of getting a trial.

John G. Ramsey states, that in a conversation which he had with Spence Hall in Tennessee, he stated that they had pretty mountains right before the door, which would be a pretty place for a wind-mill or a summer-house.   Did not say it was on the land he purchased of defendants.   In another conversation which he heard between J. G. Hall and defendant, Hall charged him with selling complainants' lands which did not belong to

him at that time, but which he had contracted for, and that he would be able to make him a deed by the time the bond called for it.   Hall then accused him of representing a corner or line in the Troy road, to be about a hundred yards beyond the fence, and that instead of the line being beyond the fence, it took off a part of the field.   Defendant replied that it was an open line —that he did not know where the line was, but did not believe the line would run in the field.   Complainant then stated that he had made a wrong statement about the amount of cleared or cultivated land—that defendant had said there were two hunddred and fifty acres of cleared land.   Defendant said it had never been measured.   Complainant said, defendant had not pointed the line running through the yard.   Defendant told him it was a marked line.   Witness has given a detailed statement of all the conversation he recollects to have taken place at his house in the deposition taken in behalf of the complainant, which is as follows : In that conversation, Hall charged defendant with being guilty of a fraud in concealing a deed of trust which was upon the property; and that in his opinion, it greatly lessened the value of the land, inasmuch as it placed it out of the power of complainants to make an advantageous disposition of it.   To this, defendant replied, that the Halls had nothing to do with the deed of trust, for he intended to discharge the debts and free it from incumbrances, but "did not deny the charge of concealment, and admitted the suppression."   Hall further charged defendant with having shown them an inclosed field as belonging to the farm, when in fact, it included part of the land claimed by Barksdale, and left them under the impression that the whole field belonged to the premises ; to which he replied, that he told them the field contained three hundred acres within the inclosure, and he still said so ; but he did not deny that he showed the whole field, without informing them that any part was owned or claimed by others.   Hall further charged him, that he stated he owned some thirty or forty acres beyond the fence, when he was informed that the fence was on the land of Carpenter & Irish.   To this Thompson replied that the charge was false, and that Flack, who had told him, was his enemy,

and that a survey would settle the question—that so far from being on the lands of Carpenter & Irish, there were twenty or thirty acres of land between the fence and their line. Hall further charged him with offering to execute a deed, when he had no power to convey. Defendant replied that he did offer to make them a deed to the land; and stated further, that at the time of the contract, he had no title to about forty acres of the land, but that he could purchase it when he saw the owner —that subsequent to the sale he had bought it, and was then able to make a deed. Hall further charged him with not informing them that the line passed through the yard, cutting off a part of the yard inclosure. To [this defendant replied, that he had pointed to them the corner north of the road, near the stable—that he told them the line run south, and that they ought to have known it would cut off part of the enclosure; but he did not deny that he had failed to inform them that a part of the yard was cut off from the premises, by which the residue is materially impaired in value. Hall tendered him back his title bonds and demanded his notes, which defendant refused.

Benjamin Land, on another examination, stated that he told the complainants that defendant had a tract of land to sell, and that he would not deceive them—that he believes this induced them to see defendant and make the purchase—that he, the witness, had heard the defendant say the land was a tip-top piece of land, and that there was not more than forty or fifty acres of waste land on the tract—that defendant offered to sell the land to witness, and stated it was a tip-top piece of land and free of incumbrance, and that the entire inclosure was his —was with Halls and Peele when they went to look at the land —that Peele, during the time he was in company, did not disclose to plaintiffs that the land was incumbered, or any part of the inclosure belonged to any one else—the lines as surveyed, and as represented by Peele, makes a difference of fifty acres owned by Irish & Carpenter, and seven or eight owned by Barksdale—that this difference makes a material alteration in the value of the property, from the odd shape it throws it into, and

from the fact that twenty or thirty acres of the best land in the field is included in Carpenter's & Irish's claim, and that outside of the field, some twenty acres is taken off, and cuts the balance off from the road in three places. Defendant requested witness to recommend any persons who wished to buy land in the country, to come and see him. From the representations of the defendant, witness did not suppose that the line from the stake north of the road, near the corner of the fence, running south, would cut off any of the yard or houses, but would run with or near the fence.

James Blackburn states, that of the land sold by defendant to complainants, and which he purchased from Winter, he owned one hundred and twenty acres, which he sold to Winter without relinquishment of dower. , Howell Hudson owned one hundred and sixty acres, liable to dower. Hudson's wife is still living. A. G. McDaniel owned twenty acres, sold by him to Winter, liable to dower—his wife still living. Flack owned forty acres, sold by him to defendant. Winter owned about six hundred acres; his wife is still living—knows the north quarter, east half, southeast quarter of section ten, R. five east town. twenty-three; and thinks five or six dollars per acre would be the full value of it, at the time Thompson sold it.

Robert Brooks states the same as to the value of the land above described—does not think it adds to the value of the land purchased by Hall from defendant, by its connection witn it —thinks there is at least three hundred acres unfit for cultivation on the tract sold by defendant to complainants—does not know how much the value of the tract is impaired by cutting off the part claimed by Carpenter & Irish, but states if it was his, he would not have the land cut off for fifty dollars per acre.

Gideon Marchant states that he carried the chain in the survey made by John A. King. Carpenter & Irish's line runs through the big field, and takes off between twenty-five and thirty acres of the most valuable part of the land—leaves the field in a bad shape, and materially injures the value of the land; if the land was witnesses, would not have it taken off for one hundred dollars per acre. Their line also takes off about

one acre and forty or fifty pannels of fence, from the forty acre field, north of the Troy road; their west line also takes off a small strip of land, and the whole string of fences on the back line of what is commonly called the ten acre field.   There is one third of the tract of land unfit for cultivation, including the hills and wet land.   The line running south from the corner stake, runs through the yard and materially injures the building site.   There is also seven or eight acres of the Barksdale land which lies within the fields, and when taken out, on account of the awkward shape which it leaves the land in, it diminishes its value seventy dollars per acre.   The improvements put upon it, fencing and clearing, is worth two hundred and eighty dollars.

John A. King states, that as agent for Carpenter & Irish, he offered to sell a tract to complainants, for ten dollars per acre. There was about one thousand acres; he agreed to sell it at one, two and three years credit.   Represented to them that the land was good, at least a large proportion of it.   Having to be absent, he wrote a title bond and notes, and left them with Thomas B. Ives, and requested James Nations and James Hack to show them the land.   He afterwards sold the same land to Thomas B. Ives and defendant, without conferring with the defendant, and took their joint notes for the payment, which he had heard Thompson admit he signed.   Witness made a survey of the land sold by Thompson to complainants.   The line running through the yard and cutting a portion of it off, materially injures the situation for building.   The addition of the six or seven acres belonging to Barksdale, would materially, if the road were fixed, enhance the value of the tract purchased by complainants.   The quality of the land claimed by Carpenter and Irish, west south of the fence, for a short distance, is very good.

James Nations states, that at the request of John A. King, he went with complainants and defendant, to show complainants a tract of land belonging to Carpenter & Irish; after leaving witness's house, some distance, defendant rode up and asked witness if there was not a good deal of wet land on the tract of

Carpenter & Irish—if there was, he wished witness to show it to as much disadvantage as he could, as he wished to sell them his land, and if they did not buy the land they were viewing, he could sell them his. Witness told him there was wet land and knobs. Witness showed complainants the outlines of the land all but one hundred and sixty acres—showed no part of the lines on that. By showing these outlines they did not get a view of the best lands; the lines were about two and a half miles in length, crossed the creek twice, and then they saw some good lands; but the lines were mostly on the points of hills and knobs. He left complainants after showing them the outlines of the tract, except the one hundred and sixty acres. Upon leaving them, he told complainants he wished them to come back the next day as he wanted to show them the balance of the land, as there was some of the best they had not seen. Thomas S. Hall remarked, that he did not know that his time would admit, and then defendant remarked they had sometime yet, and that he would show them what he could of the land. He heard the defendant say, on that, i. e. the day the deposition was taken, that he did not know anything of the land or boundaries, except what he knew from the map which they had with them on the day the examination took place.

The case was on the 27th day of June, 1840, submitted on the motion to dissolve, and upon these pleadings and this testimony, the chancellor, on the 8th day of December, 1840, dissolved the injunction, and from the order dissolving this injunction, an appeal is prosecuted to this court.

*George S. Yerger*, for appellants.

This is a bill filed by complainants to rescind a contract of sale of land, (for which the defendant executed a title bond) upon the ground of fraud and misrepresentation as to the title and quality of the land, and for an injunction to a judgment obtained on one of the notes given for the purchase money.

A full abstract of the facts is to be found in the brief of Rucks and Yerger, and it will only be necessary for me to notice what

facts are admitted by the answer, and proved by the evidence, which are as follows:

1. That Thompson knew that he had not a clear, unincumbered title to the land in fee; that the land was incumbered by deeds of trust, &c., which facts were not communicated to complainants.

2. That Thompson pointed out to them the yard inclosure and buildings, and represented that they belonged to him and were embraced in the lands he proposed to sell; which representation was untrue, as the east boundary line runs through the yard, cuts off a material part of it, and materially injures the building site.

3. That he represented the whole tract to be good tillable land, (except sixty acres,) when, in fact, three hundred acres are worthless and unfit for cultivation.

4. Six hundred and eighty acres were incumbered by a deed of trust to Winter, which fact was not communicated to complainants.

5. He represented that there were three hundred acres of cleared land, which was a strong inducement to purchase; when in truth there are only one hundred and fifty acres, which belonged to the tract and which he knew. ·

6. He showed lands that were the most valuable as belonging to the tract, when in truth they did not, as is proved.

7. That Winter conveyed six hundred and eighty acres of the land to Thompson—that this deed was not proved or acknowleged as required by law, and that it is void as to Winter's creditors, against whom there are numerous judgments.

8. That Thompson has no legal title from the original enterers of the land, who are insolvent, and judgments against most of them, but merely has transfers of the certificates on the back of them.

9. Complainants state also, that in consequence of the incumbrances and defects, they were unable to sell, although land rose in value after the purchase. They also prove that they offered to rescind the contract, but defendant refused.

Halls *v.* Thompson.

1. The chancellor dissolved the injunction mainly on the ground that complainants were in possession, and no eviction, and that they ought to have tendered the purchase money before they filed their bill. The chancellor's opinion only applies to cases of a mere defect of title, not where there has been fraud.

It is believed upon clear and settled principles that this bill ought to be sustained, and the contract rescinded. This is not a bill filed by a party in possession, solely upon the ground that his vendor had no title. It is predicated upon the ground of fraud and want of title, and that the title to a material part had failed, which rendered a rescission of the whole contract necessary. To require the complainant to tender money, which would be an offer to perform the contract, when he disavowed any intention of performing it because of fraud, is not sanctioned by any legal principle that I know of; and I presume the chancellor's opinion was not predicated upon the ground of fraud, but merely a want of title.

2. Fraud in, a contract vitiates it *in toto*. The contract is entire, and a material concealment or misrepresentation avoids it, without regard to any subsequent matter. It was vicious at the time; the party defrauded had a right the instant he discovered the fraud to call for a rescission of the whole. If a man, for instance, conceals a mortgage or other incumbrance, or represents that there are none when there are, this is a fraud, for which it may be set aside, although the party, subsequently, after proceedings have been instituted against him for the fraud, may have procured a release of the incumbrance, because the incumbrance is presumed to injure him; in this case they proved a positive injury, as it prevented complainants from disposing of their interest.

The bill charges, and the proof clearly proves, that at the time Thompson sold, there was a deed of trust on six hundred and eighty acres of the land for several thousand dollars, which fact Thompson knew but failed to communicate. If there were no other ground but this, it is manifest that equity will rescind it. The concealment of so material a fact, is a gross fraud.

"If a vendor sells an estate knowing he had no title to it, or

VOL. I.                    60

knowing there were incumbrances on it of which the vendee is ignorant, the concealment of such a material fact would clearly avoid the sale, on the ground of fraud." 1 Story's Equity, 218. This principle is distinctly admitted and decided as law by the court, in *Parham* v. *Randolph*, 4 Howard, 457, where the court say, "any intentional misrepresentation or concealment as to quality or title, by which the purchaser is imposed on, is fraudulent."

And it is no excuse in such case, for the party to say (if it were said, which it is not in this case) that he had forgotten it. *Burrows* v. *Locke*, 10 Vesey, 475–6. For if that were an excuse, fraud could always be committed with impunity.

And in such case, equity on the ground of fraud, will relieve, although the party is in possession, without being evicted. Cooper's Eq. Rep. 308. *Abbott* v. *Allen*, 2 Johns. Ch. Rep. 522. 2 Kent's Com. 470. For fraud is an exception to the rule requiring an eviction.

This principle, after an elaborate investigation, was decided also, by this court. *Parham* v. *Randolph*, 4 How. Rep. 435.

3. But it may be said, the deed of trust which constituted the incumbrance was recorded ; that the party might have found it out by examination, &c. This is not so. Fraud, in the sense of a court of equity, includes all acts, omissions and concealments, which involve a breach of legal or equitable duty, trust or confidence reposed, and which are injurious to another. 1 Story's Eq. 197. 10 Yerg. Rep. 131.

In all cases of sale and purchase, there is a mutual trust and confidence reposed between the parties. The very purchase implies, says Story, a trust or confidence, on the part of the vendee, that no such defective title exists. 1 Story's Eq. 218–19.

Misrepresentations as to the probate of wills, are frauds, although the party, by inspection, might ascertain the fact. 1 Story's Eq. 224, and cases cited. And it is frequently a work of great labor and trouble, to hunt through the records of the probate offices to find incumbrances. A party dealing with another, relies on his good faith to make known material facts.

However, the question of the registration of the incumbrance has been settled in Tennessee and in this court. *Morgan* v.

*Elam*, 6 Yerg. Rep. 108.    *Parham* v. *Randolph*, 4 How. 435.
*Kennedy* v. *Johnston*, 2 Bibb, 12.    *Tenny* v. *Hopkins*, 6 Monroe, 23.

The above authorities conclusively demonstrate that the concealment of an incumbrance is a fraud, which vitiates the sale, and enables the party to rescind.    To these may be added the case of *Allston* v. *Maxwell* et al. 1 Dev. Eq. Rep. 18.  Where the supreme court of North Carolina lay down the principle " that morality and good faith require that the vendor should disclose to the vendee, every circumstance which may induce the latter to change his mind as to the contract."

4. But there are other material misrepresentations proved.    It is shown, 1. That Thompson pointed out the yards, inclosures, buildings, &c., and represented they were included in the land, when they were, in fact, not included, as the east boundary runs through the yard, cuts off a material portion, and materially injures the building site.    2. It is shown that he represented the whole tract to be good tillable land, (one witness says tip-top) except sixty acres, when, in fact, there were three hundred wholly unfit for cultivation.    3. He represented that there were three hundred acres of cleared land, when, in truth, there are only one hundred and fifty acres which belonged to the tract, and which he knew—or if he did not complainants believed they were purchasing three hundred acres of cleared land.    4. He showed lands, which were most valuable, as belonging to the tract, which do not belong to it.

Any one of these four facts, independent of the first, is sufficient to set aside the sale.    If he made the representation, and knew it was false as to either, no authorities require to be cited, to show they were such representations as were material.

A representation that there is a never failing spring of water, where there is none, annuls the contract.    *Woods* v. *Hall*, 1 Dev. Eq. Rep. 411.

A deed for lands rescinded on the ground that the quality, value, &c. had been misrepresented.    *Thomas* v. *Todd*, 3 Littell, 337.

Misrepresentations will cause contracts to be rescinded and

set aside, although judgment is obtained at law, for the purchase money.  *Boyce* v. *Grundy*, 3 Peters, 210.

A representation that a body of good land was in the tract, when it was not, and that the land was not subject to overflow, when it was, is fraudulent, and vacates contract.  *Boyce* v. *Grundy*, 3 Peters, 210.

So it is no answer that the fraud is partial, and might be the subject of compensation by a jury.  It vitiates it altogether.  Ib.

These principles are sanctioned by this court to their full extent, in *Parham* v. *Randolph*, 4 How. 435.

5. But admitting the party who made the above representations, did not know they were untrue, still it is a fraud upon the vendee, if in fact they are not as represented.  The law is now well settled, that an innocent misrepresentation of a material fact is equally conclusive to avoid a sale, for it is a fraud and surprise on the other party.  1 Story's Eq. 202, § 193.

If a man make a false representation, whether knowingly or not, by means of which he puts the party bargaining under a mistake, it is a fraud and relievable in equity.  1 Maddox Ch. 208.  *Rosevelt* v. *Fulton*, 2 Cow. 139.  *Lewis* v. *McLemore*, 10 Yerg. Rep. 208–9.  1 Bibb's Rep. 244.

This doctrine is also fully recognized by this court.  Chief Justice Sharkey, 4 Howard, 451, says, " If the vendee undertake to make statements, he is responsible for them."

The whole of the cases were examined, and the principle fully confirmed in the case of *Smith* v. *Richards*, 13 Peters, 26.

The cases all establish the position, that in cases of fraud, the party defrauded, has a right to rescind—the contract is null as to him.  If fraud exists at the time, it vitiates; nor can any subsequent matter, without the consent of the vendee, deprive him of his right.  The above authorities show the contract is null and void, *ab initio.*  So held, also, in Louisiana.  *Gasquet* v. *Johnston*, 2 Lou. Rep. 577.  *Pratt* v. *Peel*, 3 Lou. Rep. 252.

I do not deem it necessary to examine the other points as to defect of title, or whether the dower rights have been supplied, or whether the vendor had a legal title or not, or whether the probate of the deeds were good or not; for, admitting all these

Halls *v.* Thompson.

facts to be as contended for by defendant, the case is fully made out upon the point of fraud and undue concealment. These last points are, however, examined and discussed by my associate counsel, and are clearly demonstrated by him.

*W. Yerger*, on the same side.

It seems manifest to me, from the pleadings and proof in this cause, that Thompson was guilty of fraudulent concealments and misrepresentations in relation to the boundaries of the land— the qualities of the land—the quantity of cleared land, and the incumbrance of the deed of trust.   It is a well settled rule, that if a vendor misrepresents a material fact in relation to the title or quality of estate, though innocently, and under belief of its truth—or if he conceals any material circumstance which may be calculated to enhance or depress its value in the eyes of a purchaser, a court of equity will rescind the agreement, even though it be executed; and if the incumbrance be not communicated to the purchaser, he must suppose himself about to purchase an unincumbered estate; and in contracts of this kind, the *bona fides* of the transaction is always of the last importance. 2 Johns. Ch. R. 522.

10 Yer. 131.   1 Vezey, Jr. 224.   *Edwards* v. *McLeary*, Cooper, 308.   1 Dev. Eq. 18.   3 Peters, 210.   2 Paige, 390.   4 Bibb, 183.   1 Ib. 244.   1 A. K. Marsh. 434.   6 Call, 368.   2 Am. Eq. Dig. 529.   1 Dev. Eq. 411.   3 Haywood, 141.   3 Monroe, 390.   1 Story's Eq. 393.   13 Peter's R. 26.   4 Howard's R. 455.   1 Story's Eq. 218.   7 Johns. Ch .R. 201.   Sug. on Vend. 6, 7, 9, 639, 205, 307.

2. The defendant by his own showing has not got a good title to more than one hundred acres of the land sold.   The rule on this subject is well settled, that if the vendor have not a good title the vendee is not compelled to perform his contract by paying the purchase money.   He may insist upon obtaining the legal title, and will not be compelled to take an equitable title, nor an incumbered title, nor one by which he may be involved in litigation.   2 Kent's Com. 470, 474.   Sug. on Vend. 410–11. 4 J. J. Marsh. 428.   3 Mon. 566.   5 Ib. 189.   3 Bibb, 342.   6

Mon. 288.   4 J. J. Marsh. 288.   3 Rand. 44.   2 Johns. Ch. R. 523.   3 Cranch, 270.   See, particularly, 1 A. K. Marshall, 434.

It is evident from an inspection of the title papers in this case, that Thompson is unable to make to Hall a good and valid title, which he affirmed himself able to do, by tendering a deed. The conveyance from Winter to Thompson, for six hundred and eighty acres of the land, is not acknowledged and recorded so as to bar the creditors of Winter. The certificate of acknowledgment has to be under the hand and seal of the justice, and has to be that the party signed, sealed, and delivered the deed.   This certificate has neither of the statutory requisitions.   It is therefore not good against creditors and purchasers without notice.   This identical point has been adjudicated in Pennsylvania.   2 Whar. Dig. 182.   1 Watts R. 322.   2 Ib. 31.   See also 6 Monroe, 288. 4 Dana, 329.   These decisions are based upon the principle that these acknowledgments being *ex parte*, all the statutory forms must be complied with, to render the certificate available. The deed from Blackburn to Winter is also defectively proven, as will appear by a reference to the probate on the deed, and to the form given by the statute.   Rev. Code, 455.

The legal title to the east half, and north half of section ten, is still in Jamieson.   The legal title to the north half of the west half of the southwest quarter of section fifteen, is in Blackburn. The legal title to the west half, northeast quarter of section fifteen, is in McDaniel.   The legal title to the southwest quarter of section ten, is still in Ellis; making three hundred and sixty acres of the tract, to which Thompson has not the title and which it is uncertain that he can ever get, some of the parties being insolvent, and others dead, so that it will require a tedious litigation to perfect these titles if it can ever be done.   The only title which Thompson exhibits, is a transfer on the back of the certificate by the receiver.   It does not even purport to be by the parties who entered the land; as soon as title vested in the enterers by the certificate being issued, there was no mode of conveyance known to the laws of Mississippi, by which the party could transfer the inheritance or freehold, but by writing sealed and delivered, which writing to bar creditors and pur-

chasers without notice, had to be proved, or acknowledged, or recorded. Rev. Code, 452, 453, 455.

To the lands, which Thompson claims by purchase from Barksdale and Kirkpatrick, being one hundred and sixty acres, Thompson has not shown any title whatever. His answer to the supplemental and amended bill has been excepted to, on this account, which exceptions should be sustained, and would of themselves form a sufficient objection to dissolving the injunction.

Thompson contends that his deed being on record, whether correctly or not, is notice to creditors and purchasers. This doctrine cannot be maintained; the rule being that a deed not duly proven or acknowledged, is not notice to a purchaser, though recorded in the county where the land lies. 5 Mason's C. C. R. 195. 2 Bin. 40. 3 Yeates, 186. 8 Conn. 5. 1 J. C. R. 300. 4 Kent's Com. 168. 3 Cranch, 140. 5 Conn. 173. 18 Johns. 544.

The doctrine of notice, unless the registry laws have been complied with, does not apply to creditors. This has been the uniform construction of the statute in this State; so also in Tennessee. See Mar. & Yer. 385. So, too, in Connecticut. 3 Conn. R. 406. So, also, in North Carolina. 1 Dev. Eq. R. 470. 9 Yerger, 64.

If this case were submitted on final hearing, and Thompson had exhibited a perfect title to the land, the court would not compel Hall to take it at this time. Why? Because Thompson when he sold to Hall, offered to make him a deed to the land; thereby inducing the belief that he had the title to the land unincumbered. He concealed all defects in the land—misled Hall—induced him to believe he was getting a good title. Since then, land has fallen greatly in value; the purchaser could not sell it for as much as he could heretofore have done. And this being the case, although generally time is not material, yet where the circumstances have changed, as where the property has greatly fallen or risen in value, or where there has been fraud, courts of equity will not compel a specific performance on either side. 6 Call's R. 374. 7 Yer. 565.

Halls *v.* Thompson.

*William Thompson,* for appellee.,

1, Upon the ground relied on by the complainants, that there were fraudulent misrepresentations and concealments in relation to the boundary, quantity of land, the quality of the land, &c., it is contended that the preponderance of the evidence is in favor of the defendant.

2. The change in the bill as to the incumbrance by deed of trust, it is believed, cannot avail the complainants. Thompson was not to make a deed until all the purchase money should be paid; and in executory contracts, if the vendor is able to make a deed when the time arrives at which it is to be done, it is sufficient. See *Gibson* v. *Newman,* 1 vol. How. Rep. 341. The court say, "numerous authorities might be cited to show that it is not necessary that the vendor should have a complete unincumbered title at the time he contracts; if he is able to convey at the time he has signed to do so, it is sufficient. *5 Cow.* 510. 9 Johns. Rep. 126. 6 Wheaton's Rep. 528. *Davidson* v. *Moss,* 5 How. Rep. 673.

3. It is contended that the title papers exhibited in the answers of Thompson, show a good title in him; and it is, moreover, contended that complainants cannot maintain a bill to rescind on the ground of want of title, without a tender of the purchase money, which has never been made, and the payment of which they have refused.

4. It is believed the last supplemental bill should not be allowed to be filed.

In that bill, complainants speak of various judgments being in existence against the vendors of Thompson, which by law, and the rules of the chancery court, should have been verified by filing copies of the record with the bill. But, if judgments do exist, whether there is other property out of which they may be satisfied; whether the plaintiffs will ever seek satisfaction out of these lands; whether they bind the lands; whether possession under a purchase is not notice to creditors and purchasers; whether if judgments ever existed, they have not been satisfied, are questions which the chancellor should not undertake to decide.

Halls v. Thompson.

Mr. Chief Justice Sharkey, delivered the opinion of the court.

The appellants contracted with the appellee for a tract of land in Yalobusha county, containing nine hundred acres, at twenty dollars per acre, for which they executed their three promissory notes for six thousand dollars each; the first, payable on the first of March, 1838, and the others payable annually thereafter. They took from the vendor a bond to make title, in the penalty of thirty-six thousand dollars, which bears date the 29th of November, 1836. It recites the contract of sale, and the condition is, that the vendor was to make to the vendees a good title, with covenants of warranty, on payment of the notes, without specifying at which payment the title was to be made. Suit was instituted on the first note, and the appellants filed their bill for an injunction, and for a rescission of the contract on the ground of fraud.

The various charges of fraud may be comprised under three heads. 1. Fraud committed by false representations as to the quality of the land. 2. Fraud in false representations made as to the boundary of the land. 3. Fraud in falsely representing that he, the vendor, had a good title, and in concealing incumbrances.

First, as to the fraud committed by false representations as to the quality of the land. The bill charges that Thompson represented the tract as containing only fifty or sixty acres of untillable land, whereas about three hundred acres are unfit for cultivation. This allegation is denied by the answer. The proof is, that Thompson had previously represented to a witness that there were only forty or fifty acres of untillable land on the tract, but it is not shown with certainty that this statement was made to complainants. But, admitting that it was made, it will not, under the circumstances, entitle them to relief. It appears that they remained at Thompson's house a week or two, examining land with a view of buying. They examined his tract more than once. It was shown to them by Peele, and by Thompson himself. They state in the bill that they examined the land. Under these circumstances, they must be held to abide by their own judgment. The rule of *caveat emptor* ap-

plies.    When a purchaser has examined an estate which has patent defects that could be discovered by ordinary vigilance, he can have no relief on account of such defects. Sugden on Vendors, 1, 2, 307. *Anderson* v. *Burnet*, 5 How. 167.    This rule would not apply when fraudulent means had been employed to conceal the defects, but no such thing is pretended in this case. As a general rule, the vendor must make every important disclosure of which the vendee is ignorant, but this rule is subject to some qualification.    Judge Story says, that undue concealment is the non-disclosure of facts and circumstances which one party is under, a legal or equitable obligation to communicate. 1 Story's Equiry, 216.    Chancellor Kent lays down the rule to be, that each party is bound to communicate to the other his knowledge of material facts, provided he knows the other to be ignorant of them, and they be not open and naked, or equally within the reach of his observation.    2 Kent, 482.    Judge Story says, that these remarks of the learned chancellor, must be taken with some qualification, by limiting them to cases where there is an obligation to communicate facts, or where there is a peculiar relation, trust or confidence between the parties, which will justify the presumption, that there is no undue concealment.    We may readily perceive, from the remarks of both these learned authors, that this obligation ceases when each party has an opportunity of examining for himself, and undertakes to do so without relying u pon the statements of the other.    Then the ignorance of the facts is not presumed to exist, and the confidential relations cease, and, of course, the legal obligation to make disclosures also cease s.    Fraud is not necessarily implied in such cases from concealment.    When the party undertakes to examine for himself, it is evidence of a want of confidence, and a determination to rely on his own judgment, and he is presumed to have made himself acquainted with patent defects.    It is not the mere opportunity to examine which relieves the other party from the duty to disclose, for although the opportunity exist, yet, if the party reposes confidence in the vendor, and does not examine for himself, then the duty to disclose defects is equally obligatory, and the vendor will be held bound for all statements, and

all undue concealments.   5 Day's Rep. 439.   Sugden also lays down the rule, that the vendor must disclose defects, and if he gives a false description, equity will relieve by rescinding the contract.   Sugden on Vendors, 372.   This rule, however, was evidently intended by the learned author to have an application only in cases where no examination had been made, as is shown by the class of cases which he refers to.   In the same chapter, and in other parts of his work, he holds to the doctrine of *caveat emptor*, in reference to patent defects.   The case of *Boyce* v. *Grundy*, has been also examined on this branch of the subject.   The report of the case is very unsatisfactory for want of the facts, though it is believed to be in accordance with the principles laid down by elementary writers.   Representations were there made both as to the boundary and quality, in reference to which the buyer could not inform himself.   Now, although the respondent may have made the statement imputed to him, yet it was in reference to a matter about which the complainants were competent to judge; and as they several times examined for themselves, they are precluded by their own acts.   There does not appear to be any peculiarity about the land which would show that the defects could only be ascertained at particular times, such as liability to inundation, or the like, which was one peculiarity in the case of *Boyce* v. *Grundy*.

Second, as to the fraud charged in pointing out the boundary, it appears that the eastern boundary passed through the yard, and it is said that there was a misrepresentation in pointing it out, as including the whole of the yard.   The answer denies this, and avers that a line tree in the yard was pointed out. The witness, Peele, also states that he showed the line, but a short distance north of the house, and also but a short distance south of it.   The complainants, then, could not have been well mistaken as to where it would run.   In this particular, their charge is not sustained.

There is also a charge of misrepresentation, as to the locality of the western boundary which divided the land sold, from that owned by Carpenter & Irish.   The answer states that they were told by respondent, that this line had never been run out;

that it was what is called an open line, which means an ideal line, designating the legal subdivisions of a section. The witness, Peele, states that he told them the same thing. It seems, then, that they were fully informed that the precise locality of this line was uncertain. All the statements made, were mere matters of opinion, and must have been so understood by them. They had certain means of information by a survey, and should have resorted to it. It turns out that there was a mistake in regard to this line. A survey brings Irish & Carpenter's line somewhat further east than it was supposed it would run; thus cutting off about twenty-five or thirty acres of land, which they supposed they were buying, and which the respondent supposed he was selling; but there is no deficiency in quantity. They have the nine hundred acres, which they bought; nor is there any proof that the land which had fallen to Carpenter & Irish, is of better quality, than that of complainants. It is difficult to imagine that this small strip of land could have formed the main inducement to the purchase, and it is certainly not proven that the respondent made any positive statement about it. His statement was such as must have informed the complainants that it was somewhat uncertain where this line would run. There is also a complaint that a small portion of the southern boundary was improperly pointed out, but this is not sustained by proof. Altogether the charge of fraud in reference to boundary has not been sustained. In connection with this branch of the inquiry, we may also notice the allegation, that respondent stated that he had two hundred and fifty or three hundred acres of cleared land, and that in fact the quantity is greatly less. This seems to have been stated as matter of opinion, and is a matter about which the complainants must also have formed an opinion. They examined the cleared land particularly, and cannot urge this deficiency as a reason for rescinding the contract. We would not be understood as giving sanction to a rule which would exclude parties from rescinding a contract, on account of mis-statements in reference to boundary. A case of gross deception might justify the interposition of a court of chancery, but this is certainly not one of that description.

Halls *v.* Thompson.

Third, as to the false representations in regard to title, and the concealment of incumbrances. This is the point mainly relied on for reversing the decree of the chancellor. The authorities generally concur in the leading principles on this subject, and yet there seems to be some degree of confusion arising from the grest variety of circumstances which have called for an application of these principles. Fraud, it is said, vitiates every contract into which it enters; and the vendor who makes statements which he knows to be untrue, is guilty of direct fraud, if the vendee is thereby deceived to his prejudice. And if the vendor undertakes to make statements without knowing whether they are true or false, this is also fraud in law, and he must make those statements good. So a false impression, produced with a view to mislead or entrap another, is' fraudulent. But to justify relief in chancery, the representation must be in reference to some material thing, unknown to the purchaser; which want of knowledge must not arise from mere negligence, but for a want of actual examination—for want of an opportunity to be informed, or from an entire confidence reposed in the vendor; and then the remedy must be prosecuted in good time after the injury is discovered. If the question depends on a mere matter of judgment, then there is no ground for relief. But the law holds it to be fraudulent also, in the vendor to conceal material facts which are within his knowledge, and unknown to the other party; such facts being calculated to influence the other party, and to operate to his prejudice. 1 Story's Equity, 201–2. Sugden on Vendors, 1, 2, 6, 7, 8. 1 Mar. Rep. 433. 13 Peters, 26. And these principles apply to the quality and identity of the estate, as well as to incumbrances.

Let us then see how far the facts in the case will justify an application of these principles. It is alledged in the bill, that Thompson stated to complainants that he had a clear, unincumbered title, and offered to make them a deed to the land, provided they would give a deed of trust for the purchase money; but they preferred taking his bond for a title. The complainants also charge that they confided in his representations, and that they were false, as Winter held at the time a deed of trust

for the land or a part of it, with power to sell on default of payment, which payment had not been made. It is said that these allegations are not denied by the answer, and that on a motion to dissolve the injunction, the statements in the bill which are not denied are to be taken as true. But the counsel must be laboring under a mistake in saying that the answer does not deny the existence of incumbrances. The language of the answer is this : " this defendant positively denies that he represented to complainants that the land which he claimed was free from incumbrances, or that he was then able to make to them a fee simple title to said lands ; for the fact was not so." This is an unqualified denial of false representations. But the answer goes further, and states that respondent urged complainants to take up the deed of trust out of the first payment, in order that he should be able to make them a good title; which he would do, if they would give security for the purchase money that would remain due after the first payment. This is a denial of the charge of concealment of the incumbrance. The position, then, that the injunction ought not to have been dissolved, because the allegation of concealment was not denied by the answer, is unsupported. But it is further said, the concealment of the incumbrance is established by proof. To establish the charge, a conversation is relied on, which took place between Hall and Thompson early in 1838, in Coffeeville. This conversation is detailed by three witnesses, Folkes, Arnold and Ramsey. Folkes states that Hall charged Thompson with having practiced a fraud upon him in the sale of land, and offered to give up the bond, which was then tendered to Thompson, and a demand made of the notes which had been given for the land. Thompson disregarded the tender of the bond, and the proffer to give possession of the land, and refused to give up the notes. He also denied the imputed fraud, and inquired how he had been guilty of it. Hall charged him with having concealed a deed of trust which incumbered the land and lessened the value, as it had prevented him from making an advantageous sale. The witness was asked if Thompson denied the truth of the charge, and answered that he did not, but replied that they

had nothing to do with the deed of trust; that he intended to pay it off, and free the land from the incumbrance. He also stated that he was willing to pay it off and make them a title. Arnold gives Folkes's answer as his own. Ramsey's testimony is the same in all respects except one; he states that Thompson "did not deny the charge of concealment, but admitted the suppression." On this testimony, hangs the whole application for a rescission of the contract; we shall see what weight it is entitled to. An admission of the fact spoken of, is supposed to arise, if no denial is made by the party against whom it is to operate. But this description of evidence is considered proper only for a jury, being a circumstance from which they may draw an inference. When anything is attempted to be established in this way, all the attending circumstances should be known; the temper of the parties, accompanying declarations, and the tenor of the conversation should all be stated with accuracy. It is said that such evidence is equivocal, and should be received with cautious and reluctant credence. 1 Serg. & Rawle, 398. This is manifestly so, as but few men can be supposed to know the effect of their silence, and a failure to contradict may arise from various other circumstances. It is not an invariable rule that men in conversation deny everything that is asserted against them. We cannot attach to this evidence sufficient importance to justify a rescission of the contract; such a decree should never be made, unless on a clear case fully established. It is to be remarked that Thompson in the outset, denied the fraud. If his silence is to be taken as evidence against him, his assertion must operate equally strongly in his favor. The one is counterbalanced by the other. Much stress is laid upon the testimony of Ramsey, who says that Thompson "did not deny the charge of concealment, but admitted the suppression." It is somewhat remarkable that the other witnesses heard nothing of this admission; and it is also remarkable that the witness does not give the language in which the admission was made. He has given Thompson's language when speaking of other parts of the conversation. This testimony justly weighed, raises but a very remote presumption.

To hold that it would justify a rescission, would be to establish a rule by which any artful man may obtain a rescission of a bad bargain.   On this evidence, it may be possible that a court of chancery would not decree a specific performance; but a contract will not always be rescinded when a specific performance would not be decreed.

Although this evidence is deemed insufficient to justify a reversal of the decree, yet it becomes necessary to look further into the state of the case presented by the record.   It was but an executory contract, the complainants having taken a bond for title, which of itself is a circumstance implying one of two things, either that the title is imperfect, and time is required to perfect it, or that the vendor retains the title for his own security.   But if it should be made manifest that the vendor never can make a title, or that he never can make anything more than an equitable title, the chancellor should have interposed to stay the collection of money, for which the purchaser never can receive a consideration.   At law, if the covenants are independent and there is no fraud, the vendor must rely on his obligation— but a court of chancery may afford protection against one who has engaged to convey, when it is clear that he never can do it.   Such an undertaking would amount to fraud; but the complainant who relies upon the inability of the vendor to convey, must show it.   But as Thompson has set out his title, if it be defective, the opposite parties may avail themselves of the defects.

The imperfection insisted on mostly, is that the conveyance from Winter to Thompson was improperly acknowledged and recorded, and is therefore void as to creditors and purchasers without notice.   After the long possession of complainants, the decision in the case of *Dixon & Starkey* v. *Lacoste*, made at this time, is an answer to this objection; but the certificate of the justice is itself sufficient.   Although it does not pursue the language of the statute, it contains the substance, which, by the terms of the statute, is sufficient.   Instead of certifying that Winter "acknowledged that he signed, sealed and delivered the foregoing deed," in the words given by the statute, he certifies

that " Winter acknowledged the foregoing instrument to be his act and deed." This is, in effect, a good acknowledgment. The instrument was acknowledged as his deed. A deed is a writing signed, sealed, and delivered. The words used by the justice, mean then everything that the statute requires. It is in legal effect, a certificate that he acknowledged that he signed, sealed and delivered the deed—for it was not his deed unless he had done all these things. The statute only declares that the acknowledgment " shall be in the form, or to the effect following." It was also objected that all the dower rights had not been relinquished; but this is a mistake, and the other conveyances by which Thompson acquired title are all sufficient.

The whole case presents this aspect. Thompson agreed to sell, and the complainants agreed to purchase nine hundred acres of land, worth $18000. Thompson gave bond to make title when he received the purchase money. He shows that he is able to comply with his contract. By paying the purchase money the complainants get what they contracted for. Under such circumstances we cannot think they have shown a case for relief. If fraud, in concealing the incumbrance, had been clearly proven, the case might be different; but the proof of concealment leaves the fact doubtful. Fraud must be accompanied by injury. The definition of fraud is, " deceit in grants and conveyances of land, and bargains and sales of goods, &c., to the damage of another person." Tomlin's Law Dictionary. A court of chancery must have something more tangible than a mere harmless idea or intention to act upon. But, says the counsel, there was injury, because Hall was prevented from selling for a good price. It will be recollected, that in the conversation already referred to, Hall is represented as saying that the concealment of the deed of trust greatly lessened the value of the land, as it had prevented them from selling for a good price. This testimony deserves some further remark. What had Hall to sell? Nothing more than a conditional equity; an equity when the purchase money was paid. Is it not singular that he should have said that the existence of the deed of trust of $600 had prevented him from making a good sale, when

there was an obstacle of far greater magnitude? a title in Thompson which could not be extinguished but by the payment of $18000. And is it not singular that the deed of trust should have in reality prevented the sale, when an incumbrance so much greater, and so much more obstinate was entirely overlooked? His proposed purchaser must have entertained strange ideas of the effect of incumbrances, to have overlooked the greater and shrunk from the least. It would require great credulity to give much weight to this statement. Indeed, the fair conclusion from it is rather unfortunate; it looks like a scheme designed to give color to a supposed injury. But there is another view entitled to much weight. The Halls had agreed to purchase an estate, subject to a trust. Taking the trust property, they stood in the place of Thompson. The purchase money was not paid, and the chancellor would at any time have decreed the payment of the trust incumbrance, out of the purchase money; so that if they were disposed to pay for the property, they were in no danger. On the whole, then, although there may be some doubts as to the fact of concealments (and there is certainly nothing more than doubts) the solemn contract of parties cannot be set aside on such uncertain grounds; this should only be done on clear proof. There are perhaps few contracts which are not attended by some circumstances which may look like unfair dealing; but it will not do·for a court of chancery to rescind in all such cases. In this instance the parties have been slow to make their application. It is straining much to suppose that it could not have been done sooner, and that the incumbrance never was discovered until the suit at law. If the land had increased in value to double the amount agreed on, we cannot but believe that we never should have heard of the incumbrance.

*The decree of the chancellor must be affirmed.*

Within the time prescribed by the rules of the court, Mr. W. Yerger, one of the counsel for the appellants, applied by petition for re-argument, which was granted, and he submitted the following written argument on behalf of the appellants.

*W. Yerger*, on behalf of appellants.

This case comes before the court upon a re-argument. In the former opinion, it was admitted by the court, that if Thompson had been guilty of any fraud, concealment, or misrepresentations, in relation to the title to the property, that the complainants were entitled to relief; and that even if such were not the case, still, if in fact, he did not have the title to the property, that the purchase money would be enjoined till the defendant could make title. In the opinion heretofore given, the court stated that there was not sufficient evidence of fraud, to entitle the complainants to relief upon that ground, and that the title exhibited by the defendant was good.

It is a fact to be borne in mind in the investigation of this case, that it does not come before the court, by appeal from a final decree, but from an order dissolving an injunction.

1. It is a well settled rule of equity pleading and practice, that upon motions to dissolve injunctions, whatever is stated in the bill and not denied by the answer, is to be taken for true.

2. Now the bill expressly states, that Thompson concealed the existence of the deed of trust, and this allegation is nowhere denied. In fact, the answer substantially admits the allegation, for it is admitted as charged in the bill, that "defendant did propose to make them a deed for the land, and to take a deed of trust to secure the purchase money." See pp. 9 and 30 of the record.

The testimony of the witnesses, however, is conclusive upon this point.

Jeptha Folkes says that in the early part of 1838, Hall proposed to give up the land, and tendered Thompson his bond, saying he had been defrauded. Thompson refused to rescind, and denied the imputed fraud, and asked, " How or in what way he had been guilty of the charge of fraud ?" Hall answered, " You concealed the existence of a deed of trust, which, at the sale incumbered the land, and now incumbers it, and greatly lessen its value." This charge or specification, Thompson did not deny.

John Arnold proves the same facts.

John G. Ramsay also proves the same.   See p. 184.   Ramsay proves further, " Thompson did not deny the charge of concealment, but admitted it."

We have in this record, then, the proof of concealment made out in three ways.   First, an allegation in the bill, and no denial in the answer.   Second, a direct charge of concealment, in answer to a demand of specific charges, and no denial of the the charge, which amounts to an implied admission ; and, third, we have the proof of a direct charge of concealment, and its admission at the time.

This, it does seem to me, is conclusive.   If it be not so, in the absence of contradictory testimony, then it would appear that there is no mode of establishing a fact.   The court, in the former opinion, say, that a mere failure to deny, when a charge is made, is not conclusive evidence of the fact.   That the accompanying circumstances, &c., all should be detailed, &c. These propositions will not be controverted, and it is believed that this case is clearly within the rule.   The witnesses do detail the accompanying circumstances ; they bring the parties together, place them into altercation with each other ; one makes a general charge of fraud, which is denied, and he is required to specify the particulars.   He does so, saying you concealed a deed.   This specific charge, made in answer to a demand of specifications, is not denied, say two witnesses—and says another witness, " it is not denied, but admitted."   Surely here is a sufficient detail of accompanying circumstances.

The rule of law is clear, and it is admitted by the court, that an admission may arise from the silence of the party ; and it is conclusive against him, if made under circumstances which afforded him an opportunity to act or speak, and which would properly and naturally call for some action or reply, from men similarly situated.   Greenleaf's Ev. 229.

Thus, if a tenant personally receive notice to quit on a particular day, without objection, it is an admission that his tenancy expires on that day.   2 Taunton, 109.   2 Camp. 647, 559.   13 East. 405.   4 Tenn. Rep. 361.

So, too, if a trader hear a creditor ask for him, and his clerk

reply that he is not in, and do not announce himself, it is evidence of an act of bankruptcy. *Key* v. *Shaw*, 8 Bing. 320.

The rule is, that the assertion must be of that direct kind, which naturally calls for contradiction—some assertion made to the party, with respect to his right, which, by his silence, he acquiesces in. 14 Serg. & Rawle, 393. 2 Car. & Payne, 193.

I refer the court to the first part of Cowen & Hill's notes to Phillips on Evidence, p. 192, where a complete summary of the American cases will be found; and I believe I may safely say, that in not one of the cases there cited, in which courts held the silence of the party to be evidence of the truth of the charge, were the circumstances stronger, nor such as more naturally and properly would have called for a reply, than is exhibited in the present case, in which two parties meet together at arms length and commence an altercation in reference to a trade made between them. Where one of the parties making a general allegation of fraud, is met with a prompt denial, and required to specify particulars, who, therefore, does specify and charge the concealment of a particular deed, and which specific and particular charge, made at the demand of the other, is, in the language of the witness, " not denied but admitted."

But even if mistaken in supposing the fraud to be made out, I think it is demonstrable that Thompson has not shown that he has a good title to the land, which, in a court of equity, is a prerequisite to the payment of money by a vendee. Upon this branch of the case, I refer the court to the brief made by me on the previous argument of the cause.

The COURT adhered to its former opinion.